GARY M. RESTAINO
United States Attorney
District of Arizona
JOSEPH BOZDECH
California State Bar Number 303453
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Email: joseph.bozdech@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>v.<br><br>$31,384 in United States Currency,<br><br>              Defendant *In Rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this Complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules"):

**NATURE OF THE ACTION**

1. This is a civil action in rem, brought to enforce the provision of 21 U.S.C. § 881(a)(6) for the forfeiture of United States currency which represents money or other things of value furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, and money used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. §§ 801, et seq.

2. This is a civil action in rem, brought to enforce the provision of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of United States currency which constitutes or is derived

from proceeds traceable to a violation of a specified unlawful activity, including but not limited to dealing in a controlled substance and 18 U.S.C. § 1952, travel in interstate commerce with the intent to distribute proceeds of unlawful activity as defined in 18 U.S.C. §§ 1952, 1956(c)(7), and 1961. Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j) and 28 U.S.C. §§ 1355(b) and 1395 as acts and omissions occurred in the District of Arizona that give rise to this forfeiture action. This Court has jurisdiction. 28 U.S.C. §§ 1345 and 1355; 18 U.S.C. § 981(h).

## THE DEFENDANT *IN REM*

3. The defendant *in rem* is $31,384 in United States currency ("Defendant Property").

4. The Drug Enforcement Administration ("DEA") seized the Defendant Property on January 17, 2024. The Defendant Property is currently in the custody of the United States Marshals Service.

## INTRODUCTION

5. On January 17, 2024, law enforcement had a consensual encounter with Alvin Deon Norman ("Norman") at Phoenix Sky Harbor Airport based upon a tip. Norman arrived from Philadelphia, Pennsylvania on a one-way ticket purchased within 24 hours of departure and was suspected of travelling with drug proceeds. A search of Norman's luggage and person revealed $31,384 in United States currency. A trained narcotics canine later alerted to the currency.

## ALLEGATIONS OF FACT

6. On January 17, 2024, members of the DEA airport task force (hereafter "Investigators") received information regarding passenger Norman.

7. Norman was traveling aboard American Airlines flight #2301 from Philadelphia, Pennsylvania (a drug demand area) to Ontario, California (a drug source area), with a layover in Phoenix, Arizona.

8. Norman's one-way airfare was purchased within 24 hours of departure.

2

9. Investigators knew from their training and experience that it is common for those involved in the trafficking and distribution of illegal drugs to transport their illicit proceeds via commercial airlines due to the convenience and expediency of air travel. This method of transportation allows for last-minute ticket purchases, often within 48 hours of departure, and the ability to travel a long distance in a short amount of time. Additionally, the use of couriers on airlines is inexpensive and is less apt to attract law enforcement attention than other riskier methods of transport.

10. It is common for drug and money couriers to travel on one-way tickets or to have itineraries with short turn arounds due to the uncertainty and volatile nature of drug trafficking.

11. Prior to the flight's arrival, Investigators knew Norman had an extensive criminal record regarding drug-related activity in multiple states, including a conviction in 2016 in California for which he was sentenced to 78 months in federal prison.

12. Additionally, Investigators believed Norman was released from prison on or about August 2021, and learned he was on parole and was prohibited from traveling outside the state of California without permission from his probation officer.

13. Norman's probation officer informed Investigators that Norman's only reported income was from a temporary staffing job in California, that Norman did not have any family in the Philadelphia area nor any legitimate reason to be there, and that he did not have permission to travel outside of California.

14. Investigators also learned Homeland Security Investigations ("HSI") in Los Angeles was investigating Norman as part of a drug trafficking organization ("DTO") in Los Angeles involving bulk money laundering.

15. On October 26, 2023, HSI observed Norman participate in a suspected hand-off of $140,000 in U.S. currency. HSI also conducted a search warrant at 777 Ocean Boulevard, Unit #510, Long Beach, California. Norman later told Investigators this was his home address.

16. Based on this information, Investigators responded to Terminal 4 near the arrival gate of Flight #2301 on January 17, 2024. Investigators identified and approached Norman based on his physical description and photograph.

17. Norman confirmed his identity and said he purchased his ticket about 24 hours earlier, that he was on his way home to California, and that he had been in Pennsylvania since January 3, 2024.

18. When asked, Norman said he was not travelling with a large amount of currency or any illegal drugs.

19. Norman initially denied consent to search his checked bag and instead requested Investigators author a search warrant.

20. Norman voluntarily showed Investigators several stacks of rubber-banded $100 bills from his pants pockets. Norman said the currency totaled $4,000.

21. At this point, and at the request of Norman, Investigators went with Norman upstairs from Norman's departure gate to the Commercial Narcotics Investigation Unit ("CNIU") Office where Investigators intended to author a search warrant for Norman's luggage.

22. While Investigators were speaking with Norman at the CNIU Office, Task Force Officer Elizabeth Poole ("TFO Poole") deployed trained narcotics canine Moxie to see if she would alert to Norman's luggage.

23. Moxie is a three-year-old female black Labrador/Border Collie, trained and certified to detect the odors of cocaine, heroin, methamphetamine, and fentanyl.

24. Moxie is currently certified with the National Police Canine Association and last certified on February 7, 2023. Moxie is also currently certified with the National Narcotic Detector Dog Association and last certified on October 2, 2023. TFO Poole is Moxie's only handler. If at any time during the examination Moxie smells one of the odors she is trained to detect, Moxie will present an alert at the area she smells the odor in or on.

25. To begin the process, TFO Poole first examined the main CNIU office area for hazards or other distractions, and none were observed. The office area consisted of multiple cubical spaces, desks, filing cabinets, office equipment, food cantina, trash cans, and four trainer suitcases (two hard shelled, two soft shelled) which were randomly placed within the space. TFO Poole retrieved Moxie from her office kennel and brought her into the main office. TFO Poole gave Moxie a command to search and sniff the area, off-lead, and there were no alerts during the clearing of this area or items therein. Moxie was then re-kenneled.

26. Investigators retrieved Norman's hardshell suitcase from the assigned flight and placed it within the previously cleared office space.

27. TFO Poole brought Moxie back into the office and gave her a command to search and sniff. Moxie worked the area, off-lead, and when she sniffed over the target suitcase, she changed her search pattern direction and began to detail the bag. Moxie's breathing increased, her behavior changed, and she intently focused on the zippered seams of the suitcase. Moxie then gave her trained alert by sitting and barking at the suitcase. TFO Poole recognized this behavior as a positive alert indicating Moxie could smell one of the four odors she is trained to detect (cocaine, heroin, methamphetamine, and fentanyl). TFO Poole gave Moxie a command to continue to search and sniff the office and items therein, and Moxie did not alert to any other spot or object.

28. Meanwhile, Norman told Investigators that he consented to a search of his suitcase.

29. Inside the suitcase, Investigators found a white grocery bag containing a sealed white bubble wrap envelope. Inside the sealed white bubble wrap envelope, Investigators found a clear vacuum-sealed Food Saver bag containing rubber-banded bundles of U.S. currency was found.

30. Investigators also found loose rubber bands inside the lining of the suitcase.

31. The bundles of currency in the Food Saver bag included $5, $10, $20, $50, and $100 bills, but were made up primarily of $20 bills.

32. The money found in the vacuum-sealed Food Saver bag totaled $24,000.

33. The money found on Norman's person totaled $7,384 and was made up of $1, $10, $20, $50, and $100 bills.

34. The U.S. currency found on Norman's person and in his luggage totaled $31,384 and constitutes the Defendant Property.

35. The breakdown of the Defendant Property was:
   a. Four (4) $1 bills;
   b. Forty (40) $5 bills;
   c. One-hundred and sixty-two (162) $10 bills;
   d. Nine-hundred and three (903) $20 bills;
   e. Sixty-eight (68) $50 bills; and
   f. Eighty-one (81) $100 bills.

36. Investigators are aware that $20 bills are the most common denomination used in street-level drug transactions.

37. Norman said the purpose of his visit to Philadelphia was to visit his sick grandmother. He reiterated that he flew there on January 3, 2024.

38. Norman said he brought the Defendant Property to Philadelphia because he did not trust his girlfriend Jaelah Matthews ("Matthews") with it. He said the Defendant Property was in his American Airlines Credit Union account until he withdrew it in October 2023 and deposited it in Matthews' Chase Bank account in November. Norman said about two weeks later he had Matthews withdraw it for him.

39. Norman had two cell phones on his person. Investigators asked him for the phone number to each cell phone, which Norman provided. However, when Investigators called the numbers neither cell phone rang. When confronted, Norman this time provided the correct phone numbers, which Investigators were able to confirm by calling the two cell phones.

40. Norman said the Defendant Property he was traveling with belonged to him and no one else. He said that while he was in prison people gave him money and by about August 2021 he had accumulated approximately $28,000 in his prison account.

41. Norman also said he started a small trucking company with one cargo truck when he left prison. He said he got a loan from Navy Federal Credit Union for $46,000 and bought a 16-foot cargo truck. He said he contracted with Amazon to do deliveries.

42. He said he paid off the truck loan in one year and that he had one employee, Chris Jones ("Jones"). However, when asked for Jones' contact information, Norman said it was in a third phone and he did not have that phone.

43. Norman said he ran the business and Jones did the deliveries.

44. Norman said he did not have a business website or business cards.

45. Inside the suitcase Investigators found a glass prescription drug bottle with a liquid in it. The prescription label said it was codeine phosphate and promethazine, a narcotic drug. The patient name had been scratched off the label.

46. The label listed Dr. Herbert Tisnower of Upper Darby, Pennsylvania as the prescribing physician.

47. The prescription was written on December 28, 2023 and was filled on December 29, 2023.

48. Norman said he had a prescription for the medicine found in his suitcase and showed Investigators a picture on one of his phones of a prescription bottle with his name on it for promethazine and codeine.

49. Investigators noted that the label on the bottle in the picture in his phone and the label found on the bottle in his suitcase appeared to be different.

50. A dryer sheet was loose inside the suitcase.

51. Investigators are aware that those trafficking in drugs or drug-related currency will often attempt to conceal or mask the scent of illegal drugs from law enforcement or trained narcotics canines by enclosing dryer sheets near the drugs or drug currency.

**Seizure of the Defendant Property**

52. Based on the last-minute one-way plane ticket purchase within 24 hours of departure, the large amount of currency found concealed on Norman's person and in his luggage, Norman's extensive criminal history with drug trafficking, his inconsistent statements regarding whether or not he had drugs or currency in his luggage, the prescription drug bottle with the name torn off found in his luggage, the alert to the suitcase containing the Defendant Currency by a trained narcotics canine, and Norman's suspicious statements regarding the source of the Defendant Property, DEA seized the Defendant Property as the proceeds of drug trafficking or funds that would be used for the purchase of drugs.

**Administrative Claim by Norman**

53. On February 16, 2024, the DEA received an Administrative Claim from Norman. Norman's legal counsel was Leslie M. Sammis of Sammis Law Firm.

54. Norman did not specify what the source of the Defendant Property was or provide any documentation regarding its source, such as bank records or tax returns.

55. On March 1, 2024, the case was referred by the DEA to the United States Attorney's Office in Phoenix for judicial forfeiture consideration.

**Norman's Criminal History**

56. Norman has an extensive criminal history involving drug trafficking, to include the following arrests in California:

    a. November 2010 – Possession for Sale/Sell Controlled Substance;

    b. October 2011 – Possession for Sale/Sell Controlled Substance;

    c. May 2013 – Possession of Narcotics Controlled Substance; and

    d. September 2016 – Manufacturing/Distribution of a Controlled Substance.

57. Norman was also arrested in Oklahoma in 2015 for Distribution of a Controlled Substance.

58. Lastly, Norman was arrested by the Federal Bureau of Investigation – Los Angeles in September 2016 for Distribution of PCP and Aiding and Abetting, convicted, and sentenced to 78 months in federal prison.

59. Norman was released from prison on or about August 2021 and is currently on parole.

60. As mentioned earlier, on October 26, 2023, HSI observed Norman participate in what was believed to be a bulk cash hand-off of $140,000 for a DTO in the Los Angeles area.

### Norman's Financial History

61. Norman explained in his consensual encounter with Investigators that the source of the Defendant Property was money given to him while in prison and funds he earned from a trucking business after his release.

62. Norman said he left prison with $28,000 that was given to him while he was incarcerated.

63. A records check by Investigators showed that on June 4, 2021 Norman had $18,210.41 in funds in his prison account.

64. Though a significant amount of money, $18,210.41 is much less than the Defendant Property of $31,384 seized or the $28,000 Norman claimed to have during the consensual encounter at the airport.

65. It also is unreasonable to assume Norman, a recently released felon, had not spent any of the $18,210.41 since June 4, 2021, or approximately two and a half years later.

66. Regarding his alleged trucking business, Norman did not provide any information, such as tax records, bank records, or other documents, to verify its income or existence.

67. According to Norman's probation officer, Norman's only income since leaving prison in 2021 was working for a labor staffing company.

68. Investigators later discovered a W-2 Wage and Tax Statement from an employer named Managed Career Solutions in Los Angeles, California that showed Norman earned $2,880 in wages in 2022.

69. Investigators are not aware of any additional legitimate income Norman earned since his release from prison in 2021.

70. In the Investigators' experience, drug traffickers carrying large amounts of currency often have little to no legitimate income.

**Norman's Flight History**

71. During a ten-and-a-half-month period in 2023 and 2024 Norman had the following flight history:

| Date | From | Connect | Destination | Airline |
|---|---|---|---|---|
| 03/02/23 | Los Angeles | | Miami | American |
| 03/06/23 | Miami | | Los Angeles | American |
| 04/12/23 | Columbus | Chicago | Los Angeles | American |
| 06/11/23 | Los Angeles | | Cincinnati | Delta |
| 06/13/23 | Cincinnati | | Los Angeles | Delta |
| 06/25/23 | Los Angeles | | Nashville | Delta |
| 07/02/23 | Philadelphia | | Los Angeles | American |
| 07/20/23 | Los Angeles | | Philadelphia | American |
| 07/30/23 | Philadelphia | | Los Angeles | American |
| 08/07/23 | Los Angeles | | Philadelphia | American |
| 08/17/23 | Philadelphia | | Los Angeles | American |
| 08/20/23 | Los Angeles | | Philadelphia | American |
| 08/31/23 | Philadelphia | | Los Angeles | American |
| 09/13/23 | Los Angeles | | New York | Delta |
| 09/29/23 | Philadelphia | | Los Angeles | American |
| 01/03/24 | Los Angeles | | Philadelphia | American |
| 01/17/24 | Philadelphia | Phoenix | Ontario | American |

72. According to Investigators, Norman's flight history back and forth from drug demand areas (such as Philadelphia) to drug source areas (such as Los Angeles) is an indication of drug trafficking.

73. Additionally, Norman's history of drug trafficking, his lack of legitimate income, and his parole prohibiting him from leaving the state of California, indicate that his 17 flights between the East Coast and West Coast were for the purposes of drug trafficking.

**Summary**

74. The Defendant Property was the proceeds of drug trafficking and/or facilitated drug trafficking and is subject to forfeiture for the following reasons:

    a. Norman flying one-way on a last-minute ticket from a drug-demand area to a drug-source area;

    b. Norman's criminal history involving several drug trafficking arrests, a drug trafficking conviction, and a recent drug trafficking investigation;

    c. Norman's deceptive and elusive behavior, to include telling officers no large amounts of currency would be found on his person or in his luggage, giving Investigators false phone numbers, providing an exaggerated prison account balance, an unwillingness or inability to provide information regarding his alleged business, and contradicting his probation officer by giving false statements about his travel to Pennsylvania;

    d. Norman disobeying his parole by traveling out of the state of California;

    e. The Defendant Property being concealed in a vacuum-sealed plastic bag;

    f. The Defendant Property consisting of currency bundled in rubber bands;

    g. The Defendant Property being found in luggage with a dryer sheet;

    h. The Defendant Property consisting of primarily $20 bills;

      i.      An alert to the suitcase containing the Defendant Property by a trained narcotics canine;

      j.      Norman's inability or unwillingness to show proof regarding the source of the Defendant Property;

      k.      The prescription bottle of codeine phosphate promethazine with the patient name torn off;

      l.      The differences between the prescription drug bottle found in his bag and the picture of a prescription drug bottle in his phone;

      m.      Norman's lack of a legitimate income; and

      n.      Norman's history of numerous suspicious flights.

## FIRST CLAIM FOR RELIEF

75. Based on the aforementioned facts and circumstances, the defendant property was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and therefore is subject to forfeiture to the United States pursuant to 21 U.S.C. § 981(a)(1)(A).

## SECOND CLAIM FOR RELIEF

76. The defendant property constitutes or is derived from proceeds traceable to some form of specified unlawful activity, conducted and attempted to conduct a financial transaction, i.e., the movement of the proceeds of trafficking in controlled substances in violation of 18 U.S.C. § 1952, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that process issue for an arrest warrant *in rem* issue for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment

be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

      Respectfully submitted this 13th day of May 2024.

                      GARY M. RESTAINO
                      United States Attorney
                      District of Arizona

                      *S/Joseph Bozdech*
                      JOSEPH BOZDECH
                      Assistant United States Attorney